UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TERRA CAPITAL ASSOCIATES,

                                    Plaintiff,

                 -vs-                                          07-CV-705-JTC

VERIZON PENNSYLVANIA, INC.,

                                    Defendant.

_____

This action was originally brought in New York State Supreme Court, Erie County,

in September 2007, and was removed to this court on the basis of diversity of citizenship

of the parties.  Plaintiff Terra Capital Associates ("Terra Capital") seeks money damages

from defendant Verizon Pennsylvania Inc. ("Verizon") for breach of a commercial lease of

property and premises located in Monroeville, Pennsylvania.  The parties have now filed

cross-motions for summary judgment (Items 48 and 51) seeking various forms of relief

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Verizon has also filed a

motion to compel responses to its discovery requests (Item 30).

For the reasons that follow, the motions for summary judgment are denied, and the

motion to compel is granted.

## BACKGROUND

On November 28, 1989, Terra Capital and Verizon[1] entered into a ten-year

commercial lease of premises located on approximately 6.10 acres of property at 1500

_____

[1]The original Lessor was The Bell Telephone Company of Pennsylvania, a corporate predecessor
of Verizon.  For purposes of continuity and convenience, the defendant will be referred to as Verizon
throughout this order.

Tech Center Drive in Monroeville (the "Lease") (*see* Item 49, Ex. C). Pursuant to the terms of the original agreement, Terra Capital constructed a two-story, 75,000 square foot (approx.) building on the property to be used by Verizon as warehouse and office space. The initial term of the Lease, adjusted to account for partial occupancy due to brief construction delays, ran from January 15, 1991 to January 14, 2001, at an annual rental rate of approximately $978,000.00.[2] The Lease was ultimately renewed for an additional five-year term, which expired on January 14, 2006 (*see* Item 52, Ex. D).

The dispute in this action centers around the parties' differing interpretations of the Lease provisions governing responsibility for the cost of removing several physical alterations made to the property and premises by Verizon during the course of its fifteen-year tenancy. The pertinent provisions are set forth here as follows:

> 12. <u>Alterations.</u> LESSEE may, without expense to LESSOR, make such non-structural alterations in the demised premises as it may consider necessary for its purposes, with the approval of LESSOR, said approval not to be unreasonably withheld. All structural or mechanical changes shall be approved by LESSOR's architect at LESSEE's expense. All fixtures and equipment installed by LESSEE shall remain its property and may be removed by or before the termination of this Agreement. All improvements remain the property of LESSOR unless otherwise mutually agreed upon in writing.
>
> . . . .
>
> 17. <u>Surrender of Premises.</u> Upon the termination of this Agreement, LESSEE shall surrender the demised premises in good order and condition, reasonable wear and tear, fire and other casualty excepted. LESSEE shall reimburse LESSOR for any repairs required which result from the removal of any fixtures and equipment.

---

[2] The rental rate was adjusted during the course of the initial term to account for the construction of a computer room (amortized over the full 20-year term contemplated by the Lease), and the tenant's agreement to accept responsibility for snow removal (*see, e.g.*, Item 58, Ex. 13). Upon renewal, the annual rental paid by Verizon increased to approximately $1,132,000.00 (as of 1/15/01) (*id.*).

18.    Options to Renew.  This Agreement may be renewed at the option of LESSEE at the end of the initial term under the same covenants, terms and conditions, except for rental, for an additional term of five (5) years by giving to LESSOR at least six (6) months prior to the end of such term, written notice of its exercise of such option and thereafter this Agreement may in like manner be renewed at the option of LESSEE for one (1) additional term of five (5) years. . . .

. . . .

29.    Entire Agreement, Captions.  It is expressly agreed by Tenant as a material consideration for the execution of this Lease, that there are, and were, no verbal representations, understandings, stipulations, agreements or promises pertaining to this Lease which are not incorporated herein.  It is agreed between the parties that this Lease shall not be altered, waived, amended or extended, except by a written agreement signed by Landlord and Tenant.  The captions contained in this Lease are for convenience of reference only and in no way limit or enlarge the terms or conditions of this Lease.

(Item 49, Ex. C).

The major structural alterations at issue took place between the years 1998-2000, involving the installation of approximately 3,800 square feet of exterior loading dock space, along with associated modifications to the facility's mechanical infrastructure (electrical, plumbing, HVAC, sprinklers, and generators), landscaping, parking lot, and fencing (*see* Item 52, Ex. G, p. 1).  A review of the multiple submissions made in connection with the present motions reveals an extensive history of communications between the parties regarding the construction project's effect on the leasehold, with escalating confrontational overtones and a deteriorating landlord/tenant relationship.

The original proposal for the loading dock project was transmitted under cover of a letter dated February 19, 1998, from R J. Koch, Verizon's Assistant Manager for Real Estate Leasing, to Terra Capital's Managing General Partner, Victor Liberatore, Sr. (*see* Item 52, Ex. E).  Mr. Koch requested that Mr. Liberatore indicate his "timely review and

approval" of the proposal by signing, dating, and returning the enclosed duplicate copy of the cover letter (*id.*).

On February 24, 1998, Michelle Ahrens (Terra Capital's Secretary) signed and dated the proposal letter in the space provided, and transmitted the approval under cover a separate letter, also dated February 24, 1998, which stated as follows:

> Dear Mr. Koch:
>
> Enclosed you will find an executed copy of the approval you have requested. As per your meeting with Mr. Liberatore this approval is subject to a few items that you and Mr. Liberatore have discus[s]ed and agreed upon.
>
> First, [Verizon] will either pay additional rent on the additional space or bring back the space to [its] original condition if they should vacate the space. In addition, all equipment and material that will be removed or dismantled during the construction must be saved and stored for the restoration.
>
> Mr. Liberatore requests that you keep him abreast of the happenings of this construction and if you should need any further assistance, please feel free to contact him.

(Item 58, Ex. 6).

The next documented communication on record is a June 29, 2000 letter from Christopher J. Kelly (Verizon's Executive Director for Portfolio Management) to Mr. Liberatore, advising that Verizon was exercising its option to renew the Lease for an additional five-year term, beginning on January 15, 2001 and ending on January 14, 2006 (Item 52, Ex. D). The letter also referenced discussions between the parties regarding calculation of the "lowest possible rental rate" for both a five-year and ten-year renewal period (*id.*). Terra Capital responded by letter dated September 14, 2000, authored by Ms. Ahrens, transmitting a draft "Lease Renewal & Extension" agreement as "the necessary renewal documents for . . . signature" (Item 58, Ex. 8). The agreement included a

provision for increasing the new rental rate to account for the square footage attributable to the newly constructed loading docks (*id.*).

No signature was forthcoming. Instead, the record reflects a series of telephone conversations and written communications between the parties regarding the appropriate square footage to be used as a basis for calculation of the new rental rate, as documented in letters from Mr. Liberatore and Ms. Ahrens to Mr. Kelly and Charlene Hoback, Verizon's Assistant Manager in charge of real estate. For example, on October 6, 2000, Terra Capital transmitted a revised Lease Renewal & Extension agreement for Verizon's review (which added a provision for reducing the base rent in exchange for snow and ice removal) (*see* Item 58, Ex. 10). Then, on October 31, 2000, Mr. Liberatore sent Ms. Hoback a letter referencing a recent telephone discussion regarding the renewal options facing Verizon:

> 1.) If [Verizon] is still only considering a five-year lease renewal there are two options available with respect to the additional square footage. [Verizon] can either pay rent on this additional space or provide us with documentation that upon the vacating of this premises [Verizon] will be fully responsible to restore this additional space to [its] original condition.
>
> 2. If [Verizon] is willing to entertain a ten year lease renewal then we can agree that [Verizon] will not have to restore this additional space to [its] original condition.

(*Id.*, Ex. 11). The letter also contains a rather lengthy explanation of Mr. Liberatore's rationale for taking this position, summarized briefly here as follows:

> In our discussions, you have made reference to [Terra Capital's] approval of the alterations exempting [Verizon] for any additional items with respect to such alterations. . . . The mere fact that I have approved plans for alterations does not leave this unfinished business out of the picture. If you review your own documents, you will see that there is no place in which it was agreed that . . . [Verizon] would not have to restore this space to its original condition or . . . [t]hat [Verizon] would be exempted from paying rent on this additional space.

. . . .

. . . [Y]ou and your superiors must consider that the improvements completed are very specific to the needs of [Verizon]. Without having a long-term lease commitment causes us to have a lot of risk and exposure with the present condition of the building.

(*Id.*).

Further communications regarding the matter are reflected in letters between the

parties dated January 31 and February 9, 2001 (*see id.*, Exs. 12, 13). Then, on March 23,

2001, Ms. Ahrens wrote to Ms. Hoback, stating:

I am writing this letter as a follow up to our recent discussions concerning the lease renewal . . . .

. . . [O]n March 8, 2001 we had a telephone conversation in which you agreed . . . that a few items remained open . . . which we were both going to look into and get back with each other. One of these items pertained to whether Verizon would decide to pay rent on the additional 3,815 sq. ft. of space . . . or if they would decide to completely restore this additional space to [its] original condition.

. . . .

. . . Mr. Liberatore was very explicit in the specifics that would be required in the event Verizon decided to restore this space as opposed to paying rent. Such specifics pertained to a complete description agreed and approved by Terra Capital of how this space would be restored along with an escrow account being established by Verizon for the cost of such restoration. At a bare minimum Verizon would have to front approximately $1,500,000.00 for such costs.

(*Id.*, Ex. 14).

On April 4, 2001, Ms. Hoback wrote to Ms. Ahrens, stating:

The letter dated October 31, 2000, from Mr. Liberatore gives Verizon two choices; (1) pay rent on the docks that were built by Verizon, or (2) be fully responsible for restoring this additional space to its original condition upon vacating the premises. This letter is to confirm that Verizon has elected to remove the loading docks and restore the building to its original condition prior to the lease termination date. Verizon will not pay rent on the newly

constructed loading docks, that contain 3,815 square feet of floor space, nor will Verizon deposit $1.5 million dollars in an escrow account to cover your estimate for restoring the building.

(*Id.*, Ex. 15).  Ms. Ahrens replied by letter dated April 9, 2001, advising Ms. Hoback that "Verizon does not have the right to dictate to Terra Capital Associates what perimeters [sic] it will follow if they should elect to restore this building to [its] original condition," and explaining Mr. Liberatore's reasons for protecting his property interests by requiring an escrow security, as well as complete plans and specifications for the restoration project (*id.*, Ex. 16).

On April 23, 2001, Ms. Hoback wrote back to Ms. Ahrens, stating as follows:

> As per the Lease Agreement dated November 28, 1989, Mr. Liberatore has stated in writing that he wants the building restored to its original condition.  Verizon has agreed to restore the building to its original condition, reasonable wear and tear excepted.  Mr. Liberatore approved a set of plans consisting of 41 drawings detailing the improvements on December 15, 1999.  These plans reveal the changes that were made to the building. . . .  The building will be restored to its original condition; nothing more and nothing less.

(*Id.*, Ex. 17).

It was around this time that the parties' lawyers became involved in the letter-writing activity.  On July 20, 2001, Terra Capital's attorney, J. Michael Kelleher, sent a letter to Ms. Hoback, outlining three options for Verizon to consider in order to avoid legal action with respect to its obligations under the Lease:  (1) pay rent on the additional square footage, with no responsibility for restoration of the premises; (2) obtain a detailed analysis and cost estimate for restoration, and put the money to be spent on the restoration in an escrow account; and (3) provide a one-year prior written notice of intent to terminate the lease, at which time bids would be solicited and Verizon would pay Terra Capital the bid amount

(*see id.*, Item 18).  The letter gave Verizon two weeks to respond, which it did by way of a

letter from Ms. Hoback dated August 6, 2001, which stated as follows:

> I have reviewed the three options conveyed in your letter dated July 20, 2001.  I am aware of Mr. Liberatore's concerns and for that reason assured him in writing, that Verizon will comply with the terms of the lease and will restore the building to its original condition prior to the lease termination.
>
> As you know, the Lease does not require Verizon to comply with these options.  Verizon is a very creditworthy tenant, is not in default and is not willing to amend the Lease by accepting any of the options presented in your letter.

(*Id.*, Ex. 19).

The record reflects no further communications until November 21, 2002, when Terra

Capital's attorney, Steven Wiseman, transmitted a proposed "Lease Modification

Agreement" containing the following  language:

> WHEREAS, Lessee has made various alterations and improvements to [the] Premises, being the construction of a new loading dock addition as well as the construction of a new postal loading dock addition, amounting in all to approximately 3,815 additional building square footage . . . and
>
> WHEREAS, it is the desire of the Lessor and Lessee to make certain modifications of the Lease with respect to said alterations . . . , it is agreed as follows:
>
> . . . .
>
> 2.      By the termination of said Lease, unless otherwise notified by Lessor at least six (6) months prior to said termination, Lessee shall remove said alterations and restore the premises to its condition prior to the making of such alterations.  In the event Lessee intends to remove said alterations at a time which is more than six (6) months prior to termination of the Lease, it shall notify Lessor at least three (3) months prior to commencing such removal.  Lessor shall have forty-five (45) days from the receipt of such notice to notify Lessee of Lessor's determination that such alterations shall not be removed, in which case Lessee shall not remove said alterations, which alterations upon the termination of the Lease shall remain the property of Lessor.

(Item 52, Ex. M).  Once again, this proposal was never formally adopted, and there are no

further documented communications on record until April 2005, with the approach of the

Lease termination date.

On April 5, 2005, Verizon's attorney, Jill F. Schulson, sent Terra Capital a letter

advising that:

> Verizon hereby elects to terminate the lease at the end of the term (as of
> January 14, 2006), as permitted under the lease.  In accordance with the
> lease, Verizon will surrender the premises in good order and condition,
> reasonable wear and tear and other casualty excepted.  Section 12 of the
> lease provides that "Alterations" may be removed from the property at lease
> termination or may be left on the property, as the tenant elects, *unless*
> otherwise mutually agreed upon in writing.   While Verizon offered in
> numerous letters to remove the loading docks, Verizon's offer was never
> accepted by the landlord and, therefore, the requisite "mutual" agreement
> was never reached regarding the removal of the loading docks.  Verizon
> hereby rescinds it prior offer to remove the loading docks and elects to leave
> the loading docks in place when it vacates the property at the end of the
> term, as permitted under Section 12 of the lease.

(Item 59, Ex. J).  Verizon apparently rethought this position, as reflected in Ms. Schulson's

October 3, 2005 letter to Terra Capital and Mr. Wiseman advising that "the demolition and

restoration project on the loading docks at the Property is scheduled to begin on October

10, 2005.  Such demolition and restoration work will take place over the next several

months with the planned completion to be on or about the Lease termination date of

January 14, 2006."  (Item 58, Ex. 20).  Ms. Schulson followed up with a letter to Mr.

Wiseman dated October 7, 2005, stating:

> . . . Despite what your client has informed you, my client, Verizon, has
> been in contact with the Landlord and has repeatedly attempted to schedule
> a meeting with the Landlord to work out the final details of the restoration
> project at the Property.  . . .
>
> As you are aware, my clients have engaged contractors to remove the
> docks and restore the Property to its original condition.  In consideration of

the Landlord's request, they have agreed to meet with the Landlord to have the Landlord "sign off" on the plans and specifications ("Plans and Specs"). Please note however that the Plans and Specs are those originally used when the loading docks were built and therefore, we see no reason why the Landlord should delay in approving such Plans and Specs. Any unreasonable delay by Landlord to prevent the restoration project from commencing as soon as possible may result in Verizon taking legal action against the Landlord. Verizon will commence the construction in compliance with all relevant laws with all appropriate permits having been obtained prior to construction.

(*Id.*, Ex. 21).

The circumstances surrounding this latter reference–obtaining the appropriate permits prior to commencement of the demolition and restoration project–proved to be the catalyst for the present litigation. As reflected in the record, after meeting with O.P. ["Skip"] Martin, Jr., Verizon's Real Estate Portfolio Manager, at the Monroeville building on October 11, 2005, Mr. Liberatore sent Verizon documentation outlining Terra Capital's position regarding the scope and cost of the work to be performed in order to remove the loading docks and restore the building to its original condition.[3] On October 28, 2005, Mr. Martin sent Mr. Liberatore a letter stating as follows:

I have reviewed the information that you sent to Verizon that describes the scope and cost, from your perspective, in connection with the restoration work . . . as a result of Verizon vacating the Property. Verizon disputes not only the scope of work that you request, but also the price, both of which far exceed the restoration of the loading docks.

As we have previously told you, Verizon has applied for permits to restore the loading docks and will commence restoration work within the next week or so. As I stated at our meeting at the Property on October 11, 2005, Verizon will only perform work directly connected with restoration of the

---

[3]This specific documentation has not been submitted or identified by either party as part of the summary judgment record before the court. For reference only, the court has reviewed the two separate estimates attached to plaintiff's Local Rule 56.1 response as "expert evidence which establishes that the total cost to perform [the] restoration work" at somewhere between $2.99 million and $3.47 million. (Item 57, ¶ 42; Item 58, Ex. 28.)

loading docks. Any other work that pertains to parking lot improvements, removing or constructing walls or other miscellaneous improvements will not be performed unless they are disturbed or damaged in direct connection with the restoration of the loading docks.

(Item 59, Ex. P.)

On November 7, 2005, Mr. Liberatore wrote a letter to Paul Hugus, Director of Building & Engineering for the Municipality of Monroeville, advising that Terra Capital's authorization for issuance of a demolition permit was conditioned upon Verizon's submission of detailed plans to the municipality and to Terra Capital clearly defining both (1) the area to be demolished and (2) "the restoration of the premises to its condition prior to the addition of the docks and the alterations made in connection with such addition, as per the original plans and specifications approved by [the municipality] when the addition was built." (Item 59, Ex. H.)

Mr. Hugus responded by letter dated November 10, 2005, advising Mr. Liberatore that the additional terms and conditions stated in his November 7, 2005 letter:

are landlord / tenant issues that the Municipality will not get involved [in]. As stated in prior conversations, the Municipality has received and reviewed [Verizon's] Demolition application and is prepared to issue the permit unless you officially notify the Municipality that you do not want the permit issued unconditionally. The Municipality is legally bound to action on the permit within thirty (30) days from the date of receipt. Therefore the Municipality will issue the permit before November 18, 2005 unless a letter from Terra Capital Associates is received.

(*Id.*, Ex. F.) Then, on November 14, 2005, Mr. Hugus sent a letter to Verizon's engineering contractor Robert Poplowski advising that:

The Municipality has received a Demolition Permit Application on October 21, 2005, from Verizon to remove two (2) loading dock additions for the [1500 Tech Center Drive] location. It is the Municipality's decision that a Building Permit Application must be submitted in conjunction with the Demolition Permit to assure that the restoration of the structure as well as

the fire protection system and other utilities that are involved with the demolition are properly restored. Therefore, your Demolition Permit Application has been denied . . . .

(Item 58, Ex. 22).

On November 18, 2005, Ms. Schulson sent a letter to Mr. Wiseman memorializing

a telephone conversation about the parties' divergent positions regarding the scope of the

restoration work. As stated by Ms. Schulson:

Verizon's scope of work includes not only the restoration of the loading docks, but also restoration to those areas and items located around the loading docks that were originally changed during the construction of the loading docks. This is all that Verizon ever agreed to repair . . . . The mention by Verizon in the April 4, 2001 . . . [letter] to restore the building was an offer to restore the building areas affected by the loading dock construction, not the entire building.

(Item 59, Ex. L).

On December 16, 2005, Mr. Wiseman sent Ms. Schulson a letter stating:

[N]either I or my client have ever suggested, as you appear to believe the case to be, that Verizon is required to restore the premises to its condition upon Verizon initially occupying it, but only to the condition it was in prior to when the loading dock project was undertaken. That is the unmistakable representation made by Verizon in its April 4, 2001 correspondence.

However, the project was not simply the construction of the specific loading dock space in a vacuum, but involved numerous other changes to the premises. Such changes included . . . relocation of a generator from the front of the structure to its rear, which in turn necessitated changes to the building[']s plumbing, electrical, HVAC, ceilings, lighting, and sprinkler systems; exterior landscaping changes to the parking areas and lots surrounding the structure; and removal and/or erection of walls.

My client has provided Verizon's Skip Martin with Verizon's original plans and specifications for the loading dock project. What Verizon is required and has agreed to do is, so to speak, reverse what changes and modifications were made to the premises pursuant and ancillary to those plans and specifications. Nothing more and nothing less.

(*Id.*, Ex. M).

There are no further communications of record prior to the expiration of the Lease term on January 14, 2006, at which time Verizon vacated the premises with the disputed loading docks still in place. Terra Capital filed this action in state court on September 13, 2007, alleging that Verizon's failure to live up to its written promise to remove the loading docks and restore the premises to its original condition prior to the lease termination date constitutes a breach of the Lease, causing damages amounting to over $10.8 million in construction costs, lost rental income, and other related monetary losses—including the estimated cost of removing a 3,000 gallon underground storage tank ("UST") installed in connection with the relocation of the emergency electrical generator during the construction of the loading docks.

Soon after the action was removed to this court, Verizon filed a motion seeking an order granting access to the property so that it could remove the UST at its own expense. After briefing and argument of this motion, the court held a conference with counsel, at which it was determined that the parties had commenced mediation encompassing all issues before the court, including those raised by Verizon's motion for access. Accordingly, the court denied the motion without prejudice to renew pending a report on the outcome of the mediation process (*see* Item 23).

No report was made. Instead, the parties proceeded through discovery to the deadline for filing dispositive motions, pursuant to several stipulated extensions of the case management order. Terra Capital's motion seeks entry of partial summary judgment in its favor on the issues of liability and damages for Verizon's failure to comply with its written agreement to remove the loading docks and restore the premises to its original condition prior to expiration of the term of the Lease. Verizon's motion seeks entry of summary

judgment in its favor dismissing the complaint on the ground that the evidence in the record fails as a matter of law to establish a mutual agreement that Verizon was responsible for removing the loading docks and restoring the property.

Verizon has also filed a motion for an order compelling Terra Capital to produce documents relating to a federal criminal action brought in this district against Mr. Liberatore, which resulted in a plea agreement and sentence of two years' probation on a charge of conspiracy to defraud the Internal Revenue Service by filing false documentation to support deductions claimed on Terra Capital's 2001 tax return.  *See United States v. Liberatore*, No. 09-CR-139-RJA (W.D.N.Y. August 18, 2009).  Terra Capital responds that the information sought by the motion is both irrelevant and inadmissible.

These motions are considered in turn.

## DISCUSSION

### I.    Summary Judgment

Under Rule 56(c), the court is directed to render summary judgment in favor of a party "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  When the question of law is the proper construction of the language in a contract, summary judgment may be granted when the words "convey a definite and precise meaning absent any ambiguity."  *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  Where the contract language "is susceptible to differing interpretations, each of which may be said to

be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate . . . ." *Id.* (citations omitted).

In Pennsylvania,[4] "[i]t is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). "[W]here…the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995).

> Pennsylvania law considers a contract to be ambiguous:
>
> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995) (internal quotations and citations omitted).

It is beyond dispute in this case that the structural alterations made to the demised premises in connection with the loading dock project are "improvements" governed by Section 12 of the Lease. The controlling language of Section 12 provides that "[a]ll

---

[4]The parties agree that Pennsylvania law applies to the contract issues raised in this diversity action.

-15-

improvements remain the property of [Terra Capital] unless otherwise mutually agreed upon in writing." (Item 49, Ex. C). This clause can only be read to express the parties' intent that, upon expiration of the term of the Lease, the loading docks and associated modifications would remain as improvements to the property unless the parties otherwise mutually agreed in writing to some other arrangement. The central question presented by the cross-motions for summary judgment is whether the numerous writings between the parties demonstrate, as a matter of Pennsylvania contract law, that Terra Capital and Verizon "otherwise mutually agreed."

As set forth in the discussion above, the written communications regarding the impact of the loading dock project on the leasehold began in early 1998 and continued through late 2005, spanning a considerable portion (over half) of the 15-year Lease term. Considered as a whole, these writings clearly express the parties' mutual agreement that the Lease term would expire on January 14, 2006, and that Verizon was obligated under Section 12 of the Lease to remove the loading docks and restore the premises to its original condition prior to that date. This agreement is explicitly stated in the following writings:

- Ms. Hoback's April 4, 2001 letter ("This letter is to confirm that Verizon has elected to remove the loading docks and restore the building to its original condition prior to the lease termination date.") (Item 58, Ex. 15);

- Ms. Hoback's April 23, 2001 letter ("Verizon has agreed to restore the building to its original condition, reasonable wear and tear excepted. . . . The building will be restored to its original condition; nothing more and nothing less.") (*Id.*, Ex. 17);

- Ms. Hoback's August 6, 2001 letter (". . . Verizon will comply with the terms of the lease and will restore the building to its original condition prior to the lease termination.") (*Id.*, Ex. 19);

- Ms. Schulson's October 7, 2005 letter ("As you are aware, my clients have engaged contractors to remove the docks and restore the Property to its original condition.") (*Id.*, Ex. 21);

- Mr. Wiseman's December 16, 2005 letter ("What Verizon is required and has agreed to do is, so to speak, reverse what changes and modifications were made to the premises pursuant and ancillary to [the] plans and specifications [for the loading dock project]. Nothing more and nothing less. . . .") (*Id.*, Ex. M).

Terra Capital urges the court to conclude its analysis here, and enter partial summary judgment finding that, as a matter of law, Verizon breached this agreement when it failed to deliver on its promise to restore the premises to its original condition. However, cases interpreting Pennsylvania law have consistently held that in order for an agreement to be enforceable as a matter of law, "the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain." *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956), *quoted in Quandry Solutions Inc. v. Verifone Inc.*, 2009 WL 997041, at *12 (E.D.Pa. April 13, 2009). "[T]he test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986) (citing *Lombardo*, 123 A.2d at 666).

"Although an agreement need not contain all of the terms necessary for its execution, it must 'represent a meeting of the parties' minds on the essential terms of their agreement.'" *Quandry Solutions*, 2009 WL 997041 at *12 (quoting *Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.*, 426 A.2d 1152, 1154-55 (Pa.Super.Ct. 1981)). "Essential terms" are often defined to include such items as the manner and cost of performance. *See, e.g., Lombardo*, 123 A.2d at 666; *see also Lackner v. Glosser*, 892 A.2d 21, 31 (Pa.Super.Ct. 2006); *Commonwealth v. On-Point Tech. Sys., Inc.*, 821 A.2d 641, 648 n.12 (Pa.Commw.Ct. 2003), *aff'd*, 870 A.2d 873 (Pa. 2005); *cf. Mountbatten Sur. Co., Inc. v. Brunswick Ins. Agency*, 2001 WL 34371699, at *10 (E.D.Pa. November 13, 2001) ("Essential terms of a contract usually include the parties, subject matter, scope of work, and price to be paid.") (applying New York law).

In this case, while the extensive writings exchanged by the parties during the course of their discussions about the loading dock project has been found sufficient to establish a mutual meeting of the minds with respect to the overall subject matter of the agreement, this same evidence documents the parties' ongoing, and escalating, fundamental disagreement over the scope of the work necessary for its execution. As reflected in communications both before and after Verizon's April 4, 2001 letter confirming its intent to undertake the loading dock demolition and building restoration work, Terra Capital repeatedly requested in writing that Verizon provide plans and specifications for the scope of the work, as well as escrow security to protect Terra Capital's ownership interest in the property. Verizon consistently refused to do so. As the termination date of the Lease approached, Terra Capital provided its own plans, along with a cost estimate, which Verizon disputed as "far exceed[ing] the restoration of the loading docks." (Item 59, Ex.

P).   These divergent views ultimately led to the denial of the municipal permits required for the project, and Verizon vacated the premises upon expiration of the Lease term without performing any of the work as contemplated by either party.

The conduct and expressions of intent embodied by this evidence suggest that, while the parties eventually reached agreement regarding Verizon's obligation under Section 12 of the Lease to restore the property to its original condition, they could not reach mutual assent with respect to the scope or the cost of the work necessary to accomplish the project.  As stated long ago by the Pennsylvania Supreme Court:

> It is understandable when, after a prolonged period of negotiations, parties appear to reach agreement on the essential terms of an important transaction, one of them might believe that a contract had been made. However, before preliminary negotiations ripen into contractual obligations, there must be manifested mutual assent to the terms of a bargain.

*Essner v. Shoemaker*, 143 A.2d 364, 366 (1958).

Upon thorough review of the record presented in this case, the court finds the evidence conflicting as to whether the parties intended their prolonged exchange of communications to constitute a complete mutual expression of the terms of their bargain regarding the fate of the loading dock improvements, leaving questions of fact for the jury to determine in assessing whether an enforceable agreement was ever reached.  *See, e.g., Field v. Golden Triangle Broadcasting, Inc.*, 305 A.2d 689, 691 (1973) (when evidence is conflicting as to whether parties intended a particular writing to constitute a complete expression of the agreement, question of fact exists for jury to determine whether contract was formed; citing cases), *cert. denied*, 414 U.S. 1158 (1974); *see also Richter v. Pfundt*, 2009 WL 5064383, at *3-4 (E.D.Pa. December 24, 2009) (whether revisions to real estate

purchase contract were material and whether they represented complete expression of parties' agreement are questions of fact for jury).

For these reasons, the court finds that genuine issues of fact remain with respect to material and necessary terms of the parties' agreement regarding Verizon's responsibility for removing the loading docks and restoring the property, precluding entry of summary judgment in favor of either party, in whole or in part, on the issue of Verizon's liability for breach of the Lease.

## II.    Motion to Compel

On May 14, 2009, Verizon served Terra Capital with a "Second Request for Production of Documents," seeking "[a]ll documents relating to fraud claims made by the Internal Revenue Service ("IRS") against either: (A) plaintiff Terra Capital Associates; (B) Terra Erie Associates; or, (C) Victor Liberatore, Sr.," as well as documentation relating to IRS audits of those entities for tax years 2000 through 2003 (*see* Item 32, Ex. C).  This request was made following Mr. Liberatore's entry of a plea agreement on May 4, 2009, in *United States v. Liberatore*, No. 09-CR-139-RJA, by which Mr. Liberatore agreed to a plea of guilty to a charge of conspiring to defraud the IRS in violation of 18 U.S.C. § 371 (*see* Item 32, Ex. A).[5]

Terra Capital objected to this document request on the ground that the information it seeks is irrelevant to the breach of lease issues raised by this lawsuit, and is not likely

_____

[5]As reflected on the court's docket in No. 09-CR-139-RJA, Mr. Liberatore was sentenced by United States District Judge Richard J. Arcara on August 18, 2009, to a term of two years probation, along with a monetary judgment amounting to approximately $180,000.00 in restitution and fines.  The monetary judgment was satisfied on August 25, 2009.

to lead to the discovery of admissible evidence.  Verizon then moved to compel, relying on

Rule 608(b) of the Federal Rules of Evidence.  That Rule provides:

> **Rule 608.  Evidence of Character and Conduct of Witness**
>
> . . . .
>
> **(b) Specific instances of conduct.**  Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.  They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed. R. Evid. 608(b).

Verizon contends that it is entitled to discover the facts and circumstances

underlying Mr. Liberatore's plea agreement, including invoices, tax returns, and other

documents provided to the IRS in connection with the tax fraud investigation, in order to

probe the truthfulness or untruthfulness of Terra Capital's records–and the credibility of Mr.

Liberatore himself–on cross-examination.  In this regard:

> Discovery is commonly allowed in which the discovering party seeks information with which to impeach witnesses for the opposition.  Inquiry is routinely allowed about criminal convictions of a party or witness and similar matters that go to his credibility.  Information showing that a person having knowledge of discoverable facts may not be worthy of belief is always relevant to the subject matter of the action.

8 Charles Alan Wright, et al., Federal Practice & Procedure § 2015 (3d ed.) (citing

cases).

Verizon cites *Davidson Pipe Co. v. Laventhol and Horwath*, 120 F.R.D. 455

(S.D.N.Y. 1988), in which the court set forth the following five factors as a framework for

analyzing whether the disclosure sought might reveal information affecting a particular

witness's credibility: (1) whether the prior act in question demonstrates a propensity for deception; (2) whether the prior act occurred in a context where there is a premium on veracity; (3) the lapse of time between the prior act and the events and transactions in the instant action; (4) the relationship between the subject matter of the prior deceptive act and the subject matter of the instant litigation; and, (5) whether the party seeking disclosure has a foundation for the inquiry. *Id.* at 462-63. As discussed in *Davidson Pipe*, this approach provides a reasonable means of determining the appropriate scope of discovery related to impeachment "in the same way that other discovery is constrained: by determining whether it is reasonably likely to lead to admissible evidence." *Id.* at 462; *see also* Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").

  1. Propensity for Deception

  As a factual basis for his plea agreement in No. 09-CR-139-RJA, Mr. Liberatore admitted that he claimed fraudulent deductions on his personal and partnership tax returns (including the 2001 Terra Capital return, and the 1999-2001 Terra Erie returns), and submitted false documentation in response to an IRS audit purporting to support those deductions. These admissions clearly reveal that the facts and circumstances underlying the prior deceptive act in question—tax fraud involving plaintiff Terra Capital—demonstrate a propensity for deception on the part of Mr. Liberatore, as well as the likelihood of falsified invoices, estimates, or other records relating to work at the Monroeville property.

  2. Premium on Veracity

  There can be no question in this case that submission of fraudulent tax returns and falsification of supporting invoices in response to an IRS audit occurred under in a context

where there is a premium on veracity.  *See Davidson Pipe*, 120 F.R.D. at 462 ("[S]worn statements to a . . . government agency . . . carry an obligation for truthfulness, so that falsehoods in such situations may be probative of a lack of credibility."  *Davidson Pipe*, 120 F.R.D. at 462 (citing *United States v. Sullivan*, 803 F.2d 87, 90-91 (3d Cir. 1986) (fraudulent replies on federal income tax forms probative of truthfulness and admissible for impeachment purposes); *cert. denied*, 479 U.S. 1036 (1987); other citations omitted).

3.      Lapse of Time

As reflected in the background discussion above, the prior deceptive acts (submission of fraudulent tax returns and falsified invoices to the IRS) took place at or around the same time as the majority of the communications between Terra Capital and Verizon regarding recalculation of the appropriate rental for the renewed five-year Lease term.

4.      Subject Matter

In this action, Terra Capital seeks damages based on allegations that Verizon breached its obligations under the Lease to perform work necessary to restore the Monroeville property to its condition prior to the construction of the loading docks.  In the plea agreement, Mr. Liberatore admitted that he altered invoices relating to repairs and electrical work performed elsewhere in order to mislead the IRS into believing that the work reflected on the invoices was performed at the Monroeville property.  These allegations and admissions represent a sufficient relationship between the subject matter of the prior deceptive act and the subject matter of the instant litigation to suggest  that the disclosure

sought by Verizon might reveal information affecting the reliability of Terra Capital's business records, as well as Mr. Liberatore's credibility as a witness.

     5.     Foundation

Finally, the plea agreement itself provides an appropriate factual foundation for Verizon's request for documents underlying the fraud charges brought against Mr. Liberatore.

For these reasons, the court finds that Verizon's Second Request for Production of Documents seeks information which is reasonably calculated to lead to the discovery of evidence regarding Mr. Liberatore's credibility, and the credibility of Terra Capital's business records, admissible for impeachment purposes in accordance with Fed. R. Evid. 608(b) and Fed. R. Civ. P. 26(b)(1).

## CONCLUSION

For the foregoing reasons:

1.     Plaintiff's motion for partial summary judgment (Item 48) is denied.

2.     Defendant's motion for summary judgment (Item 51) is also denied.

3.     Defendant's motion to compel (Item 30) is granted. Plaintiff is directed to produce forthwith all documents responsive to Verizon's Second Request for Production of Documents.

A telephone conference with counsel is scheduled for July 7, 2010 at 11 a.m. to discuss further proceedings in this matter. The court will initiate the call.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:  June 14, 2010
p:\pending\2007\07-705.june7.10